Filed 1/28/14  County of San Diego v. Pointe Communities of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>POINTE COMMUNITIES OF SAN DIEGO, INC., et al.,<br><br>    Defendants and Respondents. | D063074<br><br><br><br>(Super. Ct. No.<br> 37-2009-00069442-CU-BC-EC) |

APPEAL from a judgment of the Superior Court of Orange County, Luis A. Rodriguez, Judge.  Affirmed.

Thomas E. Montgomery, County Counsel, and Thomas Deák, Senior Deputy County Counsel, for Plaintiff and Appellant.

George Edward Hurley; McKenna Long & Aldridge, Charles A. Bird and Michelle A. Herrera for Defendants and Respondents.

In 1992, as one of the conditions for approving a Final Map for a real estate development, County of San Diego (County) entered into an agreement with Pointe Communities of San Diego, Inc. (PCSD) and Pointe San Diego Residential Community,

L.P. (Pointe Residential) requiring PCSD and Point Residential (together Pointe) to construct specified street improvements (the street improvement agreement), and also entered into two other agreements requiring Pointe to build certain water and sewer improvements (collectively the Subdivision Improvement Agreements). The Subdivision Improvement Agreements required completion of the improvements within 730 days of County's approval of the Final Map, but permitted County's Board of Supervisors (Board) to extend the time for completing the required improvements.

During the next 11 years, County granted Pointe a series of extensions until January 2005 to complete the improvements required by the Subdivision Improvement Agreements. In April 2005 County's Department of Public Works (DPW) informed Pointe the Subdivision Improvement Agreements had expired, Pointe was in default, and DPW was unable at that time to recommend the Board grant further extensions.

In September 2009, more than four years after the Subdivision Improvement Agreements expired and County declared Pointe in default, County filed its complaint alleging Pointe breached its obligations under the Subdivision Improvement Agreements and seeking damages and declaratory relief. Pointe moved for summary judgment, asserting County's claims were time-barred by the four-year statute of limitations applicable to claims for breach of written contracts. County opposed the motion, asserting there were triable issues of fact whether a later 2002 agreement between County and Pointe (the Tri-Party Agreement) and a 2006 amendment to the Tri-Party Agreement (the Amended Agreement) were intended to extend the time for performing the Subdivision Improvement Agreements. County argued, because the 2009 complaint was

2

filed within four years of the 2006 Amended Agreement, County's action was not time-barred. County alternatively argued, to the extent the Tri-Party Agreement and Amended Agreement were collateral to (and did not extend the time for performing) the Subdivision Improvement Agreements, County should be granted leave to amend to assert claims based on breach of the Tri-Party Agreement and Amended Agreement. The trial court rejected County's claim that the Tri-Party Agreement extended the time for performing the Subdivision Improvement Agreements, and found County's claims as pleaded were therefore time-barred. The court also rejected County's request for leave to amend, and entered judgment on the complaint in favor of Pointe. This appeal by County followed.

I

FACTUAL CONTEXT

A. The Subdivision Improvement Agreements

In 1990, the Board approved a Specific Plan Amendment (SPA 88-001) for a mixed use development in Spring Valley, along with a Tentative Map (TM-4828-1) and a series of public improvements described on TM-4828-1. The approval included a condition that, before a Final Map could be approved, Pointe was required to construct significant road improvements, including improvements to a section of Jamacha Boulevard from Huron Road to Spring Glen Lane to provide an access road to the future State Route 54 freeway.

In early 1992 the Board approved the Final Map and Pointe entered into the Subdivision Improvement Agreements obligating Pointe to perform the street, water and

3

sewer improvements required by TM-4828-1, and requiring bonds to secure Pointe's performance of its improvement obligations.[1]  Under the Subdivision Improvement Agreements, Pointe was required to complete the specified improvements within 730 days of the Board's approval of Final Map 4828-1.  However, the Subdivision Improvement Agreements provided that, if necessary, the Board could grant extensions (either unilaterally or on Pointe's request) to complete the improvements.

Between 1992 and 1994, Pointe completed some of the improvements.  In 1994, County granted Pointe a two-year extension of time to complete the improvements, and in 1999 the Board approved another extension for completion of the improvements for TM-4828-1.  In 2003, the Board approved another extension for completion of the improvements for TM-4828-1; under this extension, Pointe's time to complete the improvements required by the Subdivision Improvement Agreements was extended to January 29, 2005.

On April 15, 2005, County wrote a letter to Pointe with a reference line stating "Expiration of Improvement Agreement for County of San Diego Tract TM-4828-1, Final Map No. 12924."  That letter stated, among other things, that "[a]fter reviewing the file for the above noted project, the Department of Public Works (DPW) has identified that this project's Improvement Agreement is in default due to the original agreements

---

[1]     The street improvement agreement covering "Streets, Drainage and Monuments Only" was secured by a bond issued by Lumbermens Mutual Casualty Company, and the agreements covering "Water Only" and "Sewer Only" were secured by bonds issued by American Motorists Insurance Company.

expiring on January 29, 2005. DPW is unable to recommend an extension to the Board of Supervisors at this time."[2]

B. The Tri-Party Agreement

In early 2000, three years before the Board approved the last extension for Pointe to complete the improvements required by the Subdivision Improvement Agreements, County began meeting with representatives of Pointe (together with another developer, Atlas Homes) to discuss ways to improve Jamacha Boulevard and fund those improvements. In 2001 County made a demand against the bonding company based on Pointe's failure to widen Jamacha Boulevard as required by the Subdivision Improvement Agreements. A few months later, County, Pointe, and American Motorists Insurance Company (Surety) entered into the Tri-Party agreement.

The Tri-Party Agreement contained a series of recitations that described the interests of both Pointe and Surety in agreeing to the obligations it imposed. The Tri-Party Agreement recited that Pointe had two proposed apartment projects before County for approval, "which approval cannot be given until construction of the road

[2] The letter went on to list four "items that need to be resolved before DPW can consider recommending an extension," including that (1) the current owners of the property appeared to be different from the Pointe entities that were parties to the Improvement Agreement, (2) the current bonds were outdated both as to ownership and because changed construction costs required revised estimates and bond amounts, (3) the grading permit had expired five years earlier and needed to be renewed, and (4) there was a discrepancy in the identity of the engineer on the work. Additionally, DPW asked for additional information on the status of the project's compliance with current stormwater requirements and on what " 'substantial progress' is being made to complete the improvements required by the final map." DPW indicated this information would assist it "in determining potentials for agreement extensions."

improvements is assured for completion prior to occupancy of the apartments" and Pointe was willing to construct those improvements prior to occupancy of these projects. As to Surety, which agreed to undertake the obligation to provide financing for construction of the road improvements required by the Tri-Party Agreement, the agreement recited that Surety had issued a bond guaranteeing completion of road improvements required by TM-4828-1, the improvements had not been constructed and a demand on the bond had been made, and Surety was willing to finance the road improvements required by the Tri-Party Agreement in exchange for a right to be reimbursed by Pointe from the four properties then under Pointe's control that would be benefitted by the road improvements.[3] The Tri-Party Agreement provided Pointe would construct road improvements to Jamacha Boulevard "as required by TM4828-1 in accordance with plans to be resubmitted for approval by [the DPW]," and Surety would deposit with County

---

[3] The Tri-Party Agreement also specified County would recommend, as a condition to any Specific Plan Amendment or tentative map for a fifth property benefitting from these road improvements (the Dictionary Hill-Panorama Ranch property), the fifth property contribute its fair share of the costs as reimbursement to Surety. The Tri-Party Agreement also required Pointe to reimburse Surety 8 percent of the total construction costs when building permits were issued for phase I of Pointe's LakeView Apartment project, another 7 percent when building permits were issued for phase II, another 11 percent when building permits were issued for Pointe's Mountaintop Condominium project, and another 38 percent when building permits were issued for Pointe's Commercial Complex. The Tri-Party Agreement also provided that, if Pointe acquired the Dictionary Hill-Panorama Ranch property, Pointe would reimburse Surety the remaining 36 percent of the total construction costs upon approval of a Specific Plan Amendment or tentative map for that property, but if Pointe did not acquire the Dictionary Hill-Panorama Ranch property, County would recommend (as a condition to any Specific Plan Amendment or tentative map for that property) that a fee be imposed on that property to pay its fair share of the construction costs that would then be reimbursed to Surety.

6

funds to pay for those improvements and be entitled to reimbursement from Pointe for those outlays.[4]  County also required, as a condition to approval of Pointe's apartment projects, that the road improvements to Jamacha Boulevard be completed before occupancy permits would be issued, and specified it would not withhold approval of the projects due to road conditions on Jamacha Boulevard but would withhold occupancy permits until the road improvements were finished.  The Tri-Party Agreement contained no express references to the Subdivision Improvement Agreements and (apart from the references to TM 4828-1 and to Surety's previously issued bond) contained no references to any facts relating to Pointe's 1992 undertakings.

In June 2002, DPW received Pointe's revised plans for the work to Jamacha Boulevard contemplated by the Tri-Party Agreement.  The revised plans (processed under County Permit CG 4476) were deemed deficient in numerous respects and, after a lengthy review process involving numerous changes to and iterations of the planned work, Pointe's plans for the work to Jamacha Boulevard contemplated by the Tri-Party

---

[4]     The parties also agreed Surety's exposure on the bond it previously issued as security for the 1992 "Streets, Drainage and Monuments Only" Improvement Agreement would be reduced by all amounts deposited by Surety to finance the road improvements covered by the Tri-Party Agreement.  The parties also agreed Surety's bond issued for the 1992 "Streets, Drainage and Monuments Only" Improvement Agreement would "remain in effect" except to the extent it was "reduced by sums deposited" by Surety to pay for these road improvements.  The parties also agreed any portion of the funds deposited by Surety to finance these road improvements "determined to be attributable" to Surety's Water Improvements Bond would reduce the penal sum of that bond, and also agreed Surety would have "no obligation" with respect to any sewer improvements.

Agreement were approved by County in August 2004.[5]  After approval of the plans submitted under permit CG 4476, Pointe began working on the improvements covered under CG 4476 and the Tri-Party Agreement.

    C. The 2006 Amendment to the Tri-Party Agreement

    In March 2006, nearly one year after DPW informed Pointe the Subdivision Improvement Agreements had expired and Pointe was in default, Pointe wrote to County to explore the possibility of amending the Tri-Party Agreement to find ways to fill a funding gap for the improvements contemplated by the Tri-Party Agreement.  To fill the funding gap, which apparently arose because changes in the scope of work and delays had increased the construction costs by preventing timely completion of the Jamacha Boulevard improvements, County and Pointe in November 2006 entered into the Amended Agreement concerning completion of the improvements contemplated by the Tri-Party Agreement.

    The Amended Agreement recited that Pointe had three projects under construction, and the intent of the parties had been to insure completion of Jamacha

_____

[5]     The revised plans processed under CG 4476 called for road improvements to Jamacha Boulevard that differed from the original plans for road improvements around Jamacha Boulevard under the 1992 Subdivision Improvement Agreements.  The original plans for Jamacha Boulevard apparently contemplated Jamacha Boulevard would be improved to serve as a frontage road for the planned State Route 54 extension.  However, by this time, the planned State Route 54 extension was still not funded with sufficient rights of way to allow construction of the original improvements contemplated by the 1992 Subdivision Improvement Agreements, but traffic conditions on Jamacha Boulevard had deteriorated to level F and necessitated that an emergency measure be implemented to temporarily widen Jamacha Boulevard to four lanes until State Route 54 was put in place.  The plans processed under CG 4476 were to build this stop-gap road.

8

Boulevard prior to occupancy of the residences, but circumstances beyond Pointe's control "prevented completion of Jamacha [Boulevard] prior to the scheduled closing of residential units, necessitating the release of occupancies[.]" The Amended Agreement provided (1) Pointe would construct the road improvements "as required by TM4828-1 and [CG] 4476 in accordance with the plans approved by" DPW, (2) funding (in addition to Surety's bond as contemplated by the Tri-Party Agreement) would be secured by Pointe's agreement to deposit with County $5,952 per unit from the first units sold from its projects "to secure the remaining, unfunded portion of Jamacha [Boulevard's] construction costs to a maximum of $500,000[,]" (3) County agreed it would allow certain occupancy permits to be "issued prior to substantial completion of Jamacha [Boulevard,] including four working lanes, to the satisfaction of" DPW, and (4) Pointe agreed it would seek "no further occupancy permits or enter into any sales agreements or leases for the remainder of its property until the improvements to Jamacha Boulevard are substantially completed, including four working lanes, to the satisfaction of" DPW."

County issued the occupancy permits, Pointe sold units in its project, and Pointe deposited approximately $260,000 with County from these sales. Pointe continued working on the Jamacha Boulevard improvements and hoped to complete the improvements by mid-March 2007. However, by April 2007, all work on the improvements had stopped. Between December 2007 and September 2009 representatives of County, Pointe and Surety held numerous meetings and exchanged correspondence regarding how to complete the required improvements. However, the

9

parties were unable to resolve the dispute and County commenced this action against Pointe on September 22, 2009.

D. The Complaint and Cross-complaint

County's complaint pleaded claims against Pointe alleging it had breached its obligations under the Subdivision Improvement Agreements, which it defined as the 1992 agreements relating to street improvements, water improvements and sewer improvements, and sought damages and declaratory relief. County's complaint contained factual allegations pertaining to the Tri-Party Agreement and the Amended Agreement but pleaded no separate claims for breach of those agreements.

Pointe Residential cross-complained against County asserting County had breached the Tri-Party Agreement and the Amended Agreement by not releasing funds escrowed for the improvements required by those agreements, by unilaterally increasing the scope and costs for those improvements, and by not seeking contribution from the owner of the Dictionary Hill property.

E. The Summary Judgment Motion

Pointe moved for summary judgment, asserting County's causes of action were time-barred by the four-year statute of limitations applicable to claims for breach of written contracts. Pointe alleged the four-year statute of limitations under Code of Civil Procedure section 337, subdivision (1), applied to actions on the Subdivision Improvement Agreements, the Board did not extend Pointe's time to perform the Subdivision Improvement Agreements beyond the January 29, 2005, expiration date on those agreements, and therefore County's complaint was time-barred.

10

County did not dispute the applicable statute of limitations. However, it contended summary judgment was improper because the parties intended to extend the time for performing the obligations of the Subdivision Improvement Agreements when they entered into the Tri-Party Agreement and the Amended Agreement, and the lawsuit was timely because it was filed within four years of the date the Amended Agreement was executed. County alternatively asserted the Tri-Party Agreement and the Amended Agreement constituted independent contractual undertakings to construct the Jamacha Boulevard improvements, and its complaint, when liberally construed, stated claims for breach of the Tri-Party Agreement and the Amended Agreements. Even if it did not, County should be granted to leave to amend the complaint to state claims for breach of the Tri-Party Agreement and the Amended Agreement.[6]

The court, after hearing oral argument, confirmed its tentative ruling and granted the motion for summary judgment. It first noted the pleadings defined the boundaries of the issues to be resolved on summary judgment, and a party cannot avoid summary judgment either by presenting new and unpleaded issues in opposing a summary judgment motion or by presenting extrinsic evidence raising issues of facts on issues beyond those pleaded in the complaint. The court then concluded Pointe's evidence

---

[6]     County also asserted the Tri-Party Agreement and the Amended Agreement constituted an "acknowledgement" of Pointe's obligations to perform the Subdivision Improvement Agreements, and such acknowledgement began a new period of limitations within which to sue on the Subdivision Improvement Agreements. The trial court rejected this argument and, because County has not resurrected this argument on appeal, we deem it abandoned. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.)

11

established (1) the complaint pleaded only claims based on the 1992 Subdivision Improvement Agreements, (2) those agreements lapsed on January 29, 2005, and (3) by April 15, 2005, County had decided not to grant further extensions of the Subdivision Improvement Agreements and had determined Pointe was in default on those agreements. The court concluded Pointe met its burden of showing the County's complaint was required to be filed by January 29, 2009, and, because it was not filed until September 2009, Pointe met its burden of establishing County's claims were time-barred.

The court rejected County's effort to raise triable issues of fact on whether the Tri-Party Agreement and the Amended Agreement extended the time for performing the obligations of the Subdivision Improvement Agreements. First, the court concluded that claim was outside the scope of County's claims as pleaded, because the complaint did not assert its causes of action were based on the Tri-Party Agreement or the Amended Agreement. Moreover, the court noted neither the Tri-Party Agreement nor the Amended Agreement purported to extend the time for performance of the obligations imposed by the Subdivision Improvement Agreements.

The court also rejected County's alternative assertion-- summary judgment was improper because the complaint stated claims based on the independent contractual undertakings embodied in the Tri-Party Agreement and the Amended Agreement-- because neither the breach of contract nor the declaratory relief causes of action were based on breaches of the Tri-Party Agreement or the Amended Agreement. The court noted the complaint, although referring to the Tri-Party Agreement and the Amended Agreement, specifically alleged Pointe breached the Subdivision Improvement

12

Agreements, which it defined to include the three 1992 agreements but not to encompass either the Tri-Party Agreement or the Amended Agreement.

At oral argument, the court also rejected County's request for leave to amend the complaint to state claims based on breaches of the Tri-Party Agreement and the Amended Agreement as untimely. The court granted the summary judgment motion, and entered judgment on County's complaint in favor of PCSD and Pointe Residential and against County. County timely filed its notice of appeal.[7]

Pointe asserts (1) the appeal as to PCSD should be dismissed because no argument of error was raised as to PCSD, and (2) the judgment as to Pointe Residential is not appealable. The first argument is based on County's nomenclature in its opening brief on appeal: County's opening brief defined the term "Pointe" to mean Pointe Residential (and omitted inclusion of PCSD under the term "Pointe") and thereafter argued the judgment in favor of Pointe should be reversed. However, County has filed a notice of errata correcting this omission, and asserts that because all of its arguments applied equally to both PCSD and Pointe Residential, and all of those arguments have been responded to on the merits in the respondent's brief, no prejudice will result from permitting this correction. We agree, and therefore deny Pointe's motion to strike County's errata. Pointe also asserts the judgment as to Pointe Residential is interlocutory, and therefore is

---

[7]     County has filed a request that we judicially notice certain information, i.e., that PCSD is a forfeited corporation. However, this plea in abatement was not interposed at trial, and County has cited no pertinent authority explaining the relevance this information might have to our evaluation of County's appeal. We deny the request for judicial notice.

13

not appealable, because its cross-complaint against County remains unresolved. Although Pointe is correct as to the interlocutory nature of the appeal as to Pointe Residential, this court has the power to treat a premature appeal as a writ petition (*Olson v. Cory* (1983) 35 Cal.3d 390, 399-401), and Pointe Residential has affirmed it has no objection to this court doing so here. The interests of judicial economy will be served by resolving the issues raised both as to PCSD (in whose favor an appealable judgment was entered) and Pointe Residential (in whose favor only a nonappealable interlocutory judgment exists), because the issues raised are identical as to both PCSD's appealable judgment and Pointe Residential's nonappealable judgment. We treat the appeal as to Pointe Residential as a petition for writ of mandate rather than dismissing it. (*G. E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 323-324.)

II

APPLICABLE LAW

A. <u>Standards for Summary Judgment</u>

When a defendant moves for summary judgment on statute of limitations grounds, the defendant bears the initial burden of production to demonstrate that the limitations period has expired. (Code Civ. Proc. § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [the "initial burden of production [requires the defendant] to make a prima facie showing of the nonexistence of any triable issue of material fact"].) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar,* at p. 851.) When the party moving for summary judgment carries

14

his initial burden of production and makes a prima facie showing of the nonexistence of any triable issue of material fact, "he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Id*. at p. 850.)

Importantly, as explained in *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 332, " '[t]he burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint.* A "moving party need not '. . . refute liability on some theoretical possibility not included in the pleadings.' [Citation.]" . . . " '[A] motion for summary judgment must be directed to the *issues raised by the pleadings.* The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings.' " ' [Quoting *Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1342, second italics added by *County of Santa Clara*.]"

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210.) "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

ANALYSIS

A. Summary Judgment on the Complaint Was Proper

County apparently concedes its claims arising from Pointe's alleged breach of the Subdivision Improvement Agreements would be barred by the expiration of the statute of limitations, and therefore summary judgment would be proper, if those agreements lapsed in January 2005. Pointe's showing below satisfied its initial burden of making a prima facie showing that the Subdivision Improvement Agreements *did* lapse in January 2005, because (1) they provided for the mode by which those agreements could be extended (e.g. by Board approval either unilaterally or on request of Pointe), (2) the agreements were extended several times in accordance with the prescribed mode, (3) the last extension approved by the Board specified an expiration date of January 29, 2005, and (4) County informed Pointe on April 15, 2005, that the Subdivision Improvement Agreements had expired and were in "default due to the original agreements expiring on January 29, 2005." The burden therefore shifted to County (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850) to produce evidence raising a triable issue of fact on whether, notwithstanding County's statement the Subdivision Improvement Agreements had expired and were in default as of January 29, 2005, the Subdivision Improvement Agreements had not expired until some later date.

County's evidence in opposition to Pointe's statute of limitations showing was that the 2006 Amended Agreement was signed less than four years before County filed its lawsuit, from which County asserts its lawsuit was timely. County argued the

Subdivision Improvement Agreements had not expired, and therefore its claims for breach of those agreements were not time-barred, because the time for performing the obligations imposed by the Subdivision Improvement Agreements was first extended by the Tri-Party Agreement, and thereafter was extended by the Amended Agreement, to a date less than four years before County's lawsuit was filed.

However, as County conceded below, neither the Tri-Party Agreement nor the Amended Agreement expressly extended the time for performing the *obligations imposed by* the Subdivision Improvement Agreements. To the contrary, the Tri-Party Agreement provided it would construct road improvements to Jamacha Boulevard "as required by TM4828-1 *in accordance with plans to be resubmitted for approval by* [*the DPW*]" (italics added), and the subsequent Amended Agreement reiterated that Pointe agreed to "construct the road improvements to Jamacha Boulevard as required by TM4828-1 *and* [*CG*] *4476 in accordance with plans approved by* [*the DPW*]" (italics added), which is inconsistent with an agreement to perform road improvement obligations *previously* imposed by the Subdivision Improvement Agreements. Indeed, the structure of the Tri-Party Agreement created new obligations among its participants, rather than extending the time for performing obligations imposed under the 1992 Subdivision Improvement Agreements, because (1) the road plans had to be resubmitted, approved and permitted under a distinct permit (CG 4476),[8] (2) the parties to the Tri-Party Agreement undertook

_____

8    Although County submitted no evidence showing the degree of similarity between the road improvements required by the Subdivision Improvement Agreements and the road improvements required by the Tri-Party Agreement, the undisputed evidence

17

obligations apparently distinct from the obligations of Pointe under the Subdivision Improvement Agreements,[9] and (3) the parties (when they restructured these newly imposed obligations in the Amended Agreement in recognition that "both [the] construction costs and the scope of work for *the project* have increased since *approval of the original contract*" (italics added)) apparently acknowledged the "project" contemplated by the "original contract" was limited to the stop-gap emergency modification of Jamacha Boulevard.[10]  Because neither the Tri-Party Agreement nor the Amended Agreement contain *any* references to the Subdivision Improvement

---

showed the resubmitted plans were so distinct from the previously approved plans that it required a resubmission of the new plans for approval and a nearly two-year review process before the new plans were approved, and Pointe's evidence was that the road improvements it agreed to build under the Tri-Party agreement were substantially different in scope and purpose from the road improvements required by the Subdivision Improvement Agreements.  (See fn. 5, *ante*.)

[9]      Pointe agreed to submit plans, and thereafter to construct, a series of road improvements apparently different from the improvements under the Subdivision Improvement Agreements.  (See fn. 5, *ante*.)  Moreover, Surety (who acted as a passive guarantor under the Subdivision Improvement Agreements) became an active participant in the Tri-Party Agreement by agreeing to provide financing for this construction. Finally, County also undertook a series of obligations that were apparently new and distinct: it agreed to pay the costs associated with repairing or replacing the sewer; it agreed to recommend that a condition be attached to any tentative map or Specific Plan amendment for the Dictionary Hill Property requiring that owner to contribute to the costs associated with this new road improvement; and it agreed to approve Pointe's apartment projects with a condition that occupancy permits would be withheld until completion of the road improvements called for in the Tri-Party Agreement.

[10]      Indeed, in another recital contained in the Amended Agreement, the parties recited that, as to the units Pointe was building and County agreed to approve in consideration for Pointe's road construction obligations, "mitigation for the traffic created by these units is covered under a certified EIR for TM4828."  If the Amended Agreement merely extended Pointe's previously imposed rights and obligations under the Improvement Agreements, this language would appear to be surplusage.

18

Agreements, and were instead designed to impose a new set of rights and obligations to solve distinct concerns by each of the contracting parties, the trial court correctly ruled that neither the Tri-Party Agreement nor the Amended Agreement was understood or intended by the parties as extending the time for Pointe to perform its obligations under the Subdivision Improvement Agreements. This understanding and intent was confirmed by County because, shortly after County finally approved the plans for the Jamacha Boulevard improvements called for by the Tri-Party Agreement (and during the time Pointe was still performing the independent obligations imposed under the Tri-Party Agreement) County informed Pointe (in its April 15, 2005, letter) that the Subdivision Improvement Agreements had expired and were in "default due to the original agreements expiring on January 29, 2005."

County argues the references in the Amended Agreement to Pointe's obligation to build "the road improvements to Jamacha Boulevard as required by TM4828-1 and [CG] 4476" by implication necessarily extended the time for performing the obligations imposed on Pointe by the Subdivision Improvement Agreements. However, Pointe's showing below was that the Tri-Party and Amended Agreements required improvements to Jamacha Boulevard significantly different from the improvements required under the Subdivision Improvement Agreements (see fn. 5, *ante*), and were built under a distinct set of plans and at a different cost using different financing arrangements. County's showing below contained no evidence raising a triable issue of fact that "the road improvements to Jamacha Boulevard as required by TM4828-1 and [CG] 4476" were the *same* road improvement obligations imposed on Pointe by the Subdivision Improvement

19

Agreements, much less that "the road improvements to Jamacha Boulevard as required by TM4828-1 and [CG] 4476" were coextensive with *all of the other obligations* imposed on Pointe by the Subdivision Improvement Agreements, and therefore County's claim that the later agreements by implication necessarily extended the time for performing the earlier agreements does not have evidentiary support.

We conclude the trial court correctly ruled the Subdivision Improvement Agreements lapsed more than four years before County's complaint was filed, and County's claims asserting breach of the Subdivision Improvement Agreements were barred by the expiration of the statute of limitations.

B. Denial of County's Motion for Leave to Amend Was Not an Abuse of Discretion

County alternatively argues the trial court abused its discretion when it denied its motion for leave to amend the complaint.

*Background*

In opposition to Pointe's summary judgment motion, County asserted summary judgment was improper because the complaint set forth the terms of the Tri-Party Agreement and the Amended Agreement, and the complaint alleged that despite the Tri-Party Agreement and the Amended Agreement, Pointe had not completed the required improvements to Jamacha Boulevard. County argued these allegations, when liberally construed, stated facts sufficient to support a claim for breach of the Tri-Party Agreement and the Amended Agreements, and its 2009 complaint for breach of those later agreements was not time-barred. Pointe argued the mere reference to those later

20

agreements did not preclude summary judgment on the complaint, because (1) County's allegations demonstrated the action sought damages for breach of the Subdivision Improvement Agreements, (2) County alleged the three 1992 contracts comprised the Subdivision Improvement Agreements and did not allege the Tri-Party and the Amended Agreements were among the Subdivision Improvement Agreements, and (3) the undisputed facts showed the Subdivision Improvement Agreements involved distinctly different obligations from the obligations of the Tri-Party and Amended Agreements.

County alternatively argued that, even if its allegations were insufficient to state a claim for breach of those later agreements, the materials submitted in opposition to the motion for summary judgment demonstrated County could state a claim for breach of those agreements and County should be granted leave to amend the complaint to state claims for breach of the Tri-Party Agreement and the Amended Agreement. Pointe argued County's request for leave to amend should be denied because (1) the request for leave to file an amended complaint was untimely and (2) an order permitting County to amend to state entirely new claims for breach of the Tri-Party and Amended Agreements would be futile because such claims would themselves be time-barred. The court agreed the request was untimely, and also questioned how County would obviate the statute of limitations as to claims for breach of the Tri-Party and Amended Agreements. Accordingly, the court denied County's request to amend the complaint, and entered summary judgment in favor of Pointe.

*Applicable Legal Principles*

A trial court has wide discretion to allow the amendment of pleadings, and generally courts will liberally allow amendments at any stage of the proceeding. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.) However, unwarranted delay in seeking leave to amend may be considered by the trial court when ruling on a motion for leave to amend (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746), and appellate courts are less likely to find an abuse of discretion where, for example, the proposed amendment is " 'offered after long unexplained delay . . . or where there is a lack of diligence . . . .' " (*Hulsey v. Koehler* (1990) 218 Cal.App.3d 1150, 1159.) Thus, when a plaintiff seeks leave to amend his or her complaint only after the defendant has mounted a summary judgment motion directed at the allegations of the unamended complaint, even though the plaintiff has been aware of the facts upon which the amendment is based, "[i]t would be patently unfair to allow plaintiffs to defeat [the] summary judgment motion by allowing them to present a 'moving target' unbounded by the pleadings." (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 176.)

A trial court may also consider whether the proposed amendment would be futile. For example, it is not an abuse of the trial court's discretion to deny leave to amend when the newly proposed causes of action would be barred by res judicata (*Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1428-1429) or by the statute of limitations (*Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 230-231 (*Foxborough*)).

22

*Analysis*

County asserts, and Pointe does not dispute, that County could have pleaded facts adequate to state a cause of action for breach of the Tri-Party and Amended Agreements. However, Pointe argues (and County does not dispute) any such claim would have been time-barred had County filed a *new* complaint against Pointe on July 5, 2012, the date County sought leave to amend. Unless County's claims for breach of the Tri-Party and Amended Agreements could take advantage of the so-called "relation-back" doctrine, so any cause of action for breach of the Tri-Party and Amended Agreements would be deemed (for limitations purposes) to have been filed as of the date County filed its complaint on the Subdivision Improvement Agreements, the trial court's refusal to allow an amendment as futile would not be an abuse of discretion. (*Foxborough, supra,* 26 Cal.App.4th 217.)

"An amended complaint is considered a new action for purposes of the statute of limitations only if the claims do not 'relate back' to an earlier[,] timely[-]filed complaint." (*Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 276.) "An amended complaint relates back to a timely[-] filed original complaint, and thus avoids the bar of the statute of limitations, only if it rests on the same general set of facts and refers to the same 'offending instrumentalities,' accident and injuries as the original complaint." (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 415.) Thus, "[u]nder the relation-back doctrine, an amendment relates back to the original complaint if the amendment: (1) rests on the same general set of facts; (2) involves the same injury; and (3) refers to the same

23

instrumentality. [Citations.] An amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action. [Citations.] However, the doctrine will not apply if . . . 'the plaintiff seeks by amendment to recover upon a set of facts entirely unrelated to those pleaded in the original complaint.' " (*Pointe San Diego,* at pp. 276-277.) "[A] plaintiff who changes the essential facts upon which recovery is sought is not entitled to the benefits of the relation-back doctrine . . . ." (*Davaloo,* at p. 416.)

We are convinced County's proposed amendment would have changed the essential facts upon which recovery was sought and therefore would be outside the ambit of the relation-back doctrine.[11] The original complaint alleged the formation of agreements in 1992 apparently obligating Pointe to build permanent improvements to Jamacha Boulevard that would be integrated into a planned new freeway, and also obligating Pointe to make other improvements, including water and sewer improvements. The amended complaint presumably would have alleged the formation, 10 years later, of a different agreement apparently obligating Pointe to build different improvements under a different set of plans (e.g. temporary improvements to Jamacha Boulevard to serve as a

[11]    Ordinarily, courts assess the relation-back doctrine by comparing the factual allegations in the original and amended complaints to assess whether the amendment would rest on the same general set of facts, involve the same injury, and refer to the same instrumentality. (*Davaloo v. State Farm Ins. Co., supra,* 135 Cal.App.4th at pp. 415-416.) We are somewhat hamstrung in this analysis because County, apparently as the result of the nature of its last-minute request for leave to amend, did not submit a proposed amended complaint that would have facilitated a comparison. However, we presume the amended complaint would have alleged the formation of the Tri-Party Agreement in 2002, and its subsequent amendment in 2006, and that Pointe had defaulted on the obligations imposed by those agreements.

24

stop-gap measure pending resolution of the state's plans for the freeway, see fn. 5, *ante*), that also employed different financing arrangements and contemplated different benefits for each of the contracting parties. The original complaint also involved a different date of default (early 2005) than did the amended complaint (April 2007), different injuries (failure to construct road improvements for freeway access versus failure to complete a widening of Jamacha Boulevard), and involved potentially different counterclaims by Pointe (alleging default by County as to County's obligations under the Tri-Party and Amended Agreements that had no counterpart under the 1992 Subdivision Improvement Agreements). Because County could have commenced its action for breach of the contract alleged in its original complaint over two years *before* its claim against Pointe under the Tri-Party and Amended Agreements even *accrued*, we are satisfied County's proposed amendment would have changed the essential facts on which recovery was sought in part.

We are convinced County's proposed amendment did not rest on the same general set of facts, did not involve the same injury, and did not refer to the same instrumentality, for purposes of the relation-back doctrine. (See, e.g., *Foxborough, supra,* 26 Cal.App.4th 217 [original complaint alleged negligent transactional advice between 1978 and 1981 and proposed amendment alleged negligence when attorney served as expert consultant and witness and denied responsibility for the oversight; no relation back because latter was separate incident that arose from new and later contractual relationship between the parties]; *Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 168-169 [amended complaint alleging cause of action for age discrimination did not relate back to

25

filing of the original complaint because wrongful conduct described in the discrimination claim did not arise out of same set of facts alleged in original complaint to support claims of breach of contract and Labor Code violations]; *Coronet Manufacturing Co. v. Superior Court* (1979) 90 Cal.App.3d 342, 347 [amended complaint alleging decedent was electrocuted by lamp socket and switch manufactured by one entity did not relate back to original complaint alleging electrocution was caused by a defective hair dryer from a different manufacturer].)  Because County's proposed amendment sought to interpose a claim that would not be eligible for the relation-back doctrine and therefore would have been time-barred, the trial court did not abuse its discretion when it denied County's request for leave to amend.

### DISPOSITION

The judgment as to PCSD is affirmed.  The petition for writ of mandate as to the judgment in favor of Pointe Residential is denied.  Pointe is entitled to costs on appeal.


McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.

26